**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION**

---------------------------------------------------------- x

**TORNIER, INC.,** a Delaware corporation, and                    :
**WRIGHT MEDICAL TECHNOLOGY, INC.,** a  :   **ECF CASE**
Delaware corporation;                                            :
                                                                :   Civ. A. No. _____
                    Plaintiffs,                                  :
                                                                :
        - against -                                             :
                                                                :
**CAPROCK ORTHOPAEDIC CONSULTANTS,** :
**LLC,** a Texas limited liability corporation; **JARED** :
**GIST,** an individual; **TNACITY MEDICAL**                     :
**SOLUTIONS, LLC,** a Texas limited liability                    :
corporation;                                                     :
                                                                :
                    Defendants.                                 :
                                                                :
---------------------------------------------------------- X

### COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs TORNIER, INC., a Delaware corporation, and WRIGHT MEDICAL

TECHNOLOGY, INC., a Delaware corporation (jointly, "Wright"), for their Complaint for

Injunctive and Other Relief against Defendants CAPROCK ORTHOPAEDIC CONSULTANTS,

LLC ("Caprock"), JARED GIST ("Gist"), and TNACITY MEDICAL SOLUTIONS, LLC

("TMS") (collectively "Defendants"), state as follows:

### INTRODUCTION

This action arises out of the unlawful conduct of Gist and his wholly-owned LLC,

Caprock (jointly referred to herein as "Gist" unless specifically noted), to steal Wright's

successful North Texas business. Pursuant to an Independent Sales Representative Agreement

("Agreement"), until December, 27, 2020, Caprock as "Representative" and Gist as "Guarantor"

of Caprock's obligations to Wright, distributed, marketed and sold Wright medical device

products for joint replacement and soft tissue repair. Although Gist was bound by certain 12-month post-termination restrictive covenants not to compete or solicit Wright customers or sales agents, Gist immediately did just that by selling competitive products manufactured by Exactech, Inc. ("Exactech"), a direct competitor of Wright, through its Texas distributor, TMS.

Defendants' unlawful scheme began no later than November 2020, when Gist met with Exactech in Gainesville, Florida to discuss representing Exactech products in North Texas. At this point, Exactech had little to no market presence in North Texas. During this November 2020 meeting, Gist disclosed to Exactech the specific doctors with whom he had relationships and promised that he could bring $2 million in business from Wright to Exactech "tomorrow." At this meeting, Gist disclosed his Agreement to Exactech's attorney and both Exactech and Gist discussed how to circumvent Gist's obligations so that Defendants could unlawfully convert Wright's business to Exactech. Upon information and belief, Exactech directed Gist to connect with TMS to form a relationship through which Gist could sell Exactech's products in North Texas.[1]

Indeed, as early as January 2021, Wright learned that Gist was representing and selling Exactech product to the same doctors explicitly defined as the "Territory" to which Gist agreed *not to solicit* until December 27, 2021. On January 18, 2021, Wright promptly advised both Gist and Exactech that Wright knew of Gist's unlawful solicitations, reminded Gist of his contractual obligations, and demanded that he immediately cease and desist his unlawful activities. Although Gist responded to Wright that he understood his obligations and would continue to abide by them, that has not been the case. Unfortunately, Gist continued to breach his post-termination obligations to Wright by selling Exactech products through TMS to the same customers that Gist

---

[1] A separate lawsuit is currently pending against Exactech in the United States District Court for the Northern District of Florida, Gainesville Division, Case No. 1:21-cv-00105-MW-GRJ.

promised **not** to solicit. Despite multiple efforts by Wright to stop Gist's improper and unlawful conduct outside of court intervention, Gist refuses to honor his obligations.

As a result of Defendants' unlawful conduct, Wright lost customer goodwill and relationships in the Territory (as defined in the Agreement), as well as significant monetary damages. Wright now brings this lawsuit for breach of contract against Caprock and Gist and tortious interference with contract against TMS to enjoin Defendants from causing Wright further harm and to recover the damages caused by Defendants.

<u>**PARTIES**</u>

1.      Tornier, Inc. is a Delaware corporation with its principal place of business in Bloomington, Minnesota. Tornier is an indirect wholly owned subsidiary of Stryker Corporation, a Michigan corporation, with its principal place of business in Michigan.

2.      Wright Medical Technology, Inc. is a Delaware corporation with its principal place of business in Memphis, Tennessee. Wright is an indirect wholly owned subsidiary of Stryker Corporation, a Michigan corporation, with its principal place of business in Michigan.

3.      Upon information and belief, Caprock Orthopaedic Consultants, LLC is a Texas limited liability company with its principal place of business in Lubbock, Texas.

4.      Upon information and belief, Gist is the sole member of Caprock.

5.      Jared Gist is an individual and, upon information and belief, a citizen of the State of Texas and resides at 4004 106th Lubbock, Texas 79423.

6.      Upon information and belief, TNacity Medical Solutions, LLC ("TMS") is a Texas limited liability company, with its principal place of business in Allen, Texas.

7.      Upon information and belief, the sole member of TMS is Neylu, Inc., a Texas corporation with a principal place of business in Allen, Texas.

75120635v.2

8.      Non-party Exactech, Inc. is a Florida corporation with its principal place of business in Gainesville, Florida.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.00 excluding interest and costs.

10.     This Court has personal jurisdiction over Defendants and venue is proper in this judicial district under 28 U.S.C. § 1391(b) because all Defendants are residents of the State of Texas and Gist and Caprock reside in this judicial district.

## EVENTS GIVING RISE TO THIS ACTION

**Wright's Business**

11.     Wright is a recognized leader of surgical solutions for the upper extremities (shoulder, elbow, wrist and hand), lower extremities (foot and ankle) and biologics. Wright's products make surgeries and recoveries from injury and illness simpler, faster and more effective.

12.     Wright and its products have a broad appeal and acceptance in the marketplace and among the orthopedic surgeon community.

13.     The extremities implant and products industry is highly competitive. One of Wright's direct competitors is Exactech.

14.     To sell its products, Wright relies heavily on sales representatives and the relationships they cultivate on Wright's behalf with the surgeons in their respective territories. Wright's sales representatives may be direct employees of Wright or, like Caprock, independent sales representatives.

4

15.    Wright's sales representatives provide technical support and assistance to surgeons during surgeries, showcase Wright's products and train surgeons on Wright's highly specialized and state-of-the-art products.

16.    Surgeons who use Wright products constitute a significant portion of Wright's customer base. Wright invests substantial time and resources to build and maintain goodwill and long-term relationships with surgeons and their staffs.

17.    In terms of customer preferences, every surgeon has his or her own protocol in the operating room, and this protocol varies from surgeon to surgeon. Therefore, a critical element in maintaining a strong customer relationship is Wright's knowledge of a surgeon's preferences and method of operating. All of this information is not generally available to the public, is of great value to Wright and would give any of Wright's competitors who acquired such information, such as Exactech, an unfair competitive advantage.

18.    Wright spends a significant amount of time and money developing and maintaining long-term relationships with its customers. These relationships often take years to establish and are crucial to the success of Wright's business. Wright's sales representatives are the face of Wright to its clients. Wright's customers typically become very loyal to Wright through the sales representatives with whom they work due to the emphasis that Wright places on providing exceptional customer service and investing in its customer relationships.

**Wright's Confidential and Proprietary Information**

19.    Wright's sales representatives and distributors are given access to confidential and proprietary information. This information includes, but is not limited to, the identity of Wright's customers, financial information, marketing information, pricing, product specifications, customer information (including surgeon preferences), and sales and product usage history. This

information includes all technical aspects of Wright's products, including what sets its products apart from competitors, as well as Wright's product designs and plans for the future.

20.     As a result of being a distributor and sales representative for Wright, Caprock and Gist had substantial access to, and in fact utilized, Wright's confidential and proprietary business information.

21.     Wright's confidential and proprietary business information is not generally available to the public, is of great value to Wright and would give any of its competitors who acquired such information, including Exactech and TMS, an unfair competitive advantage.

**Gist's Relationship with Wright**

22.     Effective July 2, 2018, Gist entered into the Agreement with Wright to be able to sell Wright's products within the Territory. A true and correct copy of the Agreement is attached hereto as **Exhibit 1**. The Territory was defined to include Dr. Alejandro Verdugo and Dr. Karl Pankratz. (*See* Exhibit A to Exhibit 1.)

23.     The Agreement required, among other things, certain post-termination obligations on behalf of Caprock (Representative) and Gist (as Guarantor), including:

> 1.2     Non-competition.
>
> In consideration of the appointment by Company pursuant to Section 1.1, subject to any State law restrictions and Section 1.2(b), Representative [Caprock] and Guarantor [Gist] represent and warrant to Company that they do not (not does any entity or person affiliated with it) currently represent or promote any lines or products that are competitive with any Product, and that they shall not (nor shall any entity or person affiliated with it) during the Term and for a period of one (1) year thereafter, directly or indirectly, represent, promote, sell or otherwise commercialize within the Territory any products that are the same or substantially similar to, or competitive with, the products (including Products) manufactured and/or sold by Company at any time or by which the sale of such product would reduce the opportunity for sale of any Product. …

(Agreement, § 1.2(a).)

75120635v.2

1.3  <u>Non-Solicitation</u>. The Representative and Guarantor acknowledge that the agreements and covenants contained in this Section 1.3 are essential to protect the value of the Company's, or any of its subsidiaries' or affiliates', business and assets and by his or her current representation with the Company and its subsidiaries, the Representative and Guarantor have obtained and will obtain such knowledge, contacts, know-how, training and experience and there is a substantial probability that such knowledge, know-how, contacts, training and experience could be used to the substantial advantage of a competitor of the Company or any of its subsidiaries or affiliates and to the Company's, or any of its subsidiaries' or affiliates', substantial detriment.  Therefore, the Representative and Guarantor agree that for the period commencing on the date of this Agreement and ending on the first anniversary of the termination of the Representative's Agreement hereunder (such period is hereinafter referred to as the "Restricted Period"), the Representative and Guarantor shall not whether for their or their own account or for the account of any other individual, partnership, firm, corporation or other business organization (other than the Company), directly or indirectly solicit, endeavor to entice away from the Company or any of its subsidiaries or affiliates, or otherwise directly interfere with the relationship of the Company or any of its subsidiaries or affiliates with (a) any person who, to the knowledge of the Representative or Guarantor, is employed by or otherwise engaged to perform services for the Company or any of its subsidiaries or affiliates (including, but not limited to, any independent sales representatives or organizations) or (b) who is, or was within the then most recent 12-month period, a customer, client or prospect of the Company, its predecessors or any of its subsidiaries or affiliates with whom or with which the Representative or Guarantor had contact during the one (1) year period prior to the termination of this Agreement. …

(Agreement, § 1.3.)

2.2  <u>Confidentiality</u>.    Representative acknowledges and agrees that all Company Information is confidential and proprietary to Company. Representative shall not use any Company Information during the Term or thereafter for any purpose other than as permitted or required for performance by Representative under this Agreement.  Representative further agrees not to disclose or provide any Company Information to any third party.  For purposes of this Section 2.2, "Company Information" means all information, other than information in the public domain or expressly designated by Company as non-confidential, which is disclosed to Representative by Company or embodied in the Products and relating in any way to Company's manufacturing processes, markets, customers, pricing, patents, inventions, products, procedures, designs, plans, organization, employees or business in general.

(Agreement, § 2.2.)

24.  Gist, as "Guarantor," agreed to "guarantee in full the obligations of [Caprock] under th[e] Agreement" as if Gist "had executed the Agreement as Representative." (Agreement,

§ 5.5.) Thus, Gist is personally liable for compliance with the Agreement, including its post-termination obligations.

25.    On July 1, 2019 and again on December 30, 2019, the Agreement was amended. Pertinently, the Second Amendment to the Independent Sales Representative Agreement ("Second Amendment") extend the Term of the Agreement to December 27, 2020 and added additional doctors to the Territory. (*See* Second Amendment at § 1 and Exhibit A, respectively, a true and correct copy of which is attached hereto as **Exhibit 2**.)

26.    Between July 2, 2018 and December 27, 2020, Caprock, through both Gist and its assistant sales representatives, marketed, represented and sold Wright products in the Territory.

27.    On December 27, 2020, the Agreement terminated and, pursuant to the post-termination obligations therein, Caprock and Gist, as Representative and Guarantor, were prohibited for a period of one year from selling products competitive to those offered for sale by Wright to any of the doctors identified as the Territory, and were prohibited from soliciting any person employed by or performing services on behalf of Wright. Further, Gist was prohibited from disclosing or using any Wright Company Information (as quoted above).

**Defendants' Scheme to Steal Wright's Business in the Territory**

28.    Prior to the termination of the Agreement, Gist began conspiring with Exactech to supplant Wright in the Territory and in the North Texas region.

29.    On or before November 2020, and several weeks prior to the Agreement's termination, Gist began discussions with Exactech about representing its products in the Territory. Part of Gist's consideration of representing Exactech included discussions with Dr. Verdugo about whether he would switch to Exactech products if Gist began representing them.

30.    In November 2020, Gist solicited and induced a Wright sales representative in the area, Matthew Redwine ("Redwine"), to travel with him to Exactech's headquarters in

Gainesville, Florida to discuss representing Exactech products that are competitive to those offered by Wright.

31.    Leading up to the in-person meeting, on November 19, 2020, Gist and Redwine joined a Zoom call with representatives from both TMS and Exactech to discuss representing Exactech products to Wright customers in the Territory. During that Zoom call, Gist discussed his non-compete obligations to Wright and claimed he "could find a loophole," boasted he could move $2 million in business to Exactech, and identified the specific Wright customers in the Territory and the inventory needs to service those doctors,

32.    Following the November 19, 2020 Zoom call, Gist and Redwine traveled to Gainesville, Florida to meet with Exactech representatives. Similar to the Zoom call, Gist represented to Exactech that he had $2 million in annual sales that he could "bring over tomorrow" to Exactech and expressly identified all the doctors in the North Texas region whom Gist sold Wright products to. Part of Gist's representation to Exactech about how much business he could convert to Exactech was based on his prior discussion with Dr. Verdugo about committing to continue to do business with Gist even if he began selling Exactech products.

33.    At this same November 2020 meeting, Gist and Redwine provided Exactech with their respective agreements with Wright, which include the post-termination non-compete and non-solicit obligations. Brazenly, both Gist and Exactech's in-house lawyer discussed circumventing the obligations and Exactech's lawyer even boasted to Gist and Redwine that Exactech "can get you out of it" -- referring to their respective post-termination obligations owing to Wright. Gist, for his part, represented that he could circumvent his obligations by selling Exactech products through Redwine and other sales representatives that Gist employed.

34.     Upon information and belief, following the November 2020 meeting, Exactech facilitated a relationship between Gist and TMS, a distributor of Exactech's products based in Allen, Texas.

35.     Upon information and belief, Gist and TMS entered into a contractual relationship to allow Gist to sell Exactech products through TMS in the North Texas area, including the Territory defined in Gist's Agreement with Wright.

36.     Ultimately, Gist and Redwine were provided the opportunity to sell Exactech products. Gist agreed and partnered with TMS, while Redwine refused because of his non-compete obligations to Wright.

37.     When Redwine told Gist that he intended to stay with Wright and honor his non-compete obligations, Gist told Redwine that "I'm going to take all your business."

38.     No sooner had the Agreement with Wright terminated, then Gist continued soliciting the sale of Exactech's products to the very same customers that Gist promised not to solicit.

39.     Indeed, in early January 2021, Gist coordinated a demonstration lab with TMS representatives and Drs. Verdugo, Pankratz and others to demonstrate Exactech shoulder products, including Exactech's GPS Glenoid System. The GPS Glenoid System is designed to assist surgeons in mapping and locating the precise placement of implant products in conjunction with shoulder surgeries. Exactech's GPS Glenoid System is directly competitive to Wright's own proprietary Blueprint system.

40.     On January 15, 2021, Dr. Verdugo did a shoulder surgery with Exactech products through Gist and has substantially ceased using Wright products for Exactech since that surgical procedure.

75120635v.2

41.     On January 18, 2021, Wright wrote Gist, with a copy to Exactech's general counsel, to remind Gist of the obligations owed to Wright and to demand that Gist, personally and through Caprock, comply with the contractual obligations under the Agreement. A true and correct copy of the January 18, 2021 letter is attached hereto as **Exhibit 3**.

42.     Only a couple weeks later, on February 2, 2021, Deck Goddard ("Goddard"), a Wright sales representative, received a text message from Dr. Pankratz's nurse regarding scheduling a shoulder surgery with Gist using Exactech products. Dr. Pankratz was one of the doctors that was part of the Territory and a doctor Gist was prohibited from selling competitive products to. Put simply, Gist was brazenly selling Exactech products to Dr. Pankratz right after receiving Wright's January 18, 2021 letter demanding that he immediately cease and desist from such conduct.

43.     Since February 2021, Dr. Pankratz, through Gist, has substantially ceased using Wright products and converted his business to using Exactech's competitive products.

44.     On February 9, 2021, after learning of Gist's case with Dr. Pankratz, Wright again wrote Gist, and again copying Exactech's general counsel, advised that Wright was aware of Gist's unlawful activities and to demand that that such activities cease immediately. A true and correct copy of the February 9, 2021 letter is attached hereto as **Exhibit 4**.

45.     On February 12, 2021, Gist respond to Wright. A true and correct copy of Gist's February 12, 2021 response is attached hereto as **Exhibit 5**. Gist falsely claimed that he had abided by the obligations under the Agreement and would continue to do so.

46.     Exactech failed and refused to respond to either the January 18 or February 9, 2021 letters.

75120635v.2

47.     Only a few weeks later, on April 28, 2021, Redwine witnessed Exactech products at Gist's office. Gist apparently believed that the mere passage of a few weeks would allow him to continue flouting his obligations to Wright.

48.     On May 3, 2021, Exactech products were identified by Wright representatives at Grace Medical Center with Gist's name on the packaging. Those Exactech products were identified for use with Drs. Verdugo and Pankratz, both of whom are doctors identified as part of the Territory that Gist is prohibited from soliciting or selling competing products to.

49.     In addition to the foregoing wrongdoing, Wright learned that Gist also solicited other doctors in the Territory to use Exactech products. All in direct violation of Gist's obligations to Wright.

50.     As Gist blatantly ignored Wright's previous letters, on May 7, 2021, outside counsel to Wright wrote both Gist and Exactech to provide a final demand to honor Wright's contractual rights or face litigation. True and correct copies of the May 7, 2021 letters are attached hereto as **Exhibit 6**.

51.     On May 14, 2021, Gist responded that "I understand my agreement and will continue to abide by the agreement." However, Gist's conduct continues unabated.

52.     Once again, Exactech ignored Wright's concerns and failed to respond.

**Effect of Defendants' Improper and Unlawful Conduct**

53.     While only discovery will reveal the full scope of Defendants' misconduct, Gist and TMS worked in concert to leverage and exploit the goodwill that Gist was entrusted to develop on behalf of Wright for the benefit of Defendants. Indeed, Gist and TMS set up a lab to demonstrate and sell Exactech products to doctors identified as part of the prohibited Territory in the Agreement and Gist sold and is continuing to solicit and sell Exactech products into the Territory.

12

54.     Defendants' blatant refusal to honor and respect Wright's contractual rights threaten Wright's customer goodwill, the stability of its sales force which is being solicited by Gist, and the value of its Company Information and trade secrets which are undoubtedly being disclosed and exploited by Defendants. Without injunctive relief, Wright stands to suffer yet more irreparable harm and financial damage.

55.     All told, Defendants are causing, threatening, and/or will continue to cause or threaten significant irreparable harm to Wright, including the loss of value of confidential and/or proprietary information, the loss of valuable employee relationships, the loss of long-standing customer relationships, loss of goodwill, as well as damage to Wright's reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make Wright whole, as it has no adequate remedy at law.

## COUNT I
## BREACH OF CONTRACT
### Against Gist and Caprock

56.     Wright hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 54.

57.     The Agreement that Wright entered into with Caprock and Gist is a valid and enforceable contract.

58.     Wright performed all of the material duties and obligations it agreed to and owed Caprock and Gist under the Agreement.

59.     The post-termination activity restrictions contained in the Agreement are reasonable in both scope and duration, and are necessary to protect Wright's legitimate protectable interests in its customer and employee relationships, confidential business information, as well as its goodwill and other legitimate business interests.

75120635v.2

60.     Caprock and Gist breached, and continue to breach, their post-termination contractual obligations owing to Wright by: (a) providing services, covering cases, making proposals, making sales and/or servicing products, whether directly or indirectly, in the same Territory that Caprock and Gist are prohibited from selling competing products to; (b) soliciting, inducing or influencing, or attempting to solicit, induce or influence, persons performing services on behalf of Wright to terminate their relationship with Wright and sell Exactech products.

61.     As a result of Caprock and Gist's breaches of contract, Wright has been irreparably injured, and it continues to face irreparable injury. Wright is threatened with losing its customer and employee relationships, its customer goodwill, and the value of its confidential and proprietary information, all for which a remedy at law is inadequate. Accordingly, Caprock and Gist must be enjoined and restrained by Order of this Court. To the extent a remedy at law is adequate, Wright seeks actual, incidental, compensatory, and consequential damages, along with its reasonable attorneys' fees and interest.

## COUNT II
## TORTIOUS INTERFERENCE WITH CONTRACT
### Against TMS

62.     Wright hereby repeats, realleges, and incorporates by reference the allegations which are contained in Paragraphs 1 through 61.

63.     As set forth above, the Agreement with Caprock and Gist is a valid and enforceable contract.

64.     The post-termination activity covenants, confidentiality covenants and other provisions contained in the Agreement are reasonable in scope and duration and are reasonably necessary to protect Wright's legitimate protectable interests in its long-standing, well established and valuable customer relationships, its Company Information, as well as its goodwill.

14

65.    TMS was fully aware of the Agreement and Gist and Caprock's post-termination obligations set forth therein because Gist disclosed the Agreement to TMS during the November 19, 2020 Zoom call and because such post-relationship covenants are commonplace in the medical device sales marketplace and would have been requested by TMS before entering into an agreement with Gist.

66.    Despite having knowledge of the Agreement, TMS intentionally induced, permitted or incentivized Gist and Caprock to violate the post-termination obligations owed to Wright, without justification, in an effort to use Gist and Caprock to steal Wright's business in the Territory, destroy Wright's North Texas sales infrastructure, and unfairly compete with Wright.

67.    On information and belief, TMS's intentional interference was malicious, unjustified and accomplished through wrongful means.

68.    As a result of TMS's intentional interference, Wright has suffered irreparable and other significant injuries.

## PRAYER FOR RELIEF

WHEREFORE, Wright seeks judgment in its favor and an Order against Defendants that grants the following relief:

A.    Permanently enjoins Defendants, and all parties in active concert or participation with them, from soliciting the sale of any products that are competitive to those offered by Wright to any customer identified in the Territory of the Agreement;

B.    Permanently enjoins Defendants, and all parties in active concert or participation with them, from soliciting, servicing, covering cases for or making proposals to any customer identified in the Territory of the Agreement;

C.    Permanently enjoins Defendants, and all parties in active concert or participation with them, from using or disclosing any of Wright's confidential, proprietary information;

15

D.    Permanently enjoins Defendants, and all parties in active concert or participation with them, from hiring, soliciting, inducing or influencing, encouraging, or attempting to hire, solicit, induce, influence, or encourage any Wright employee, agent, or independent contractor to terminate his or her employment and/or business relationship with Wright;

E.    Permanently enjoins Defendants, and all parties in active concert or participation with them, from encouraging, inducing and/or facilitating Wright employees to breach their contractual obligations owing to Wright;

F.    Orders Defendants and all parties in active concert or participation with them to return to Wright all originals and copies of all files, devices and/or documents that contain or relate to Wright's confidential and proprietary information, including without limitation, all computers, electronic media, PDA's and electronic storage devices;

G.    Awards Wright actual, incidental, compensatory, and consequential damages to be proven at trial;

H.    Awards Wright exemplary or punitive damages in an amount to be proven at trial due to Defendants' willful and malicious activities;

I.    Awards Wright its costs and expenses incurred herein, including reasonable attorneys' fees and interest;

J.    Awards Wright to receive all sums disgorged from the Defendants; and

K.    Awards Wright such further relief as the Court deems necessary and just.

75120635v.2

**Dated:  September 30, 2021**

Respectfully submitted,


By: _/s/ Fernando M. Bustos_
     Fernando M. Bustos
     State Bar No. 24001819
     fbustos@bustoslawfirm.com
BUSTOS LAW FIRM, P.C.
P. O. Box 1980
Lubbock, Texas 79408-1980
Phone:      (806) 780-3976
Facsimile:  (806) 780-3800

- and -

Michael D. Wexler (To Be Admitted *Pro Hac Vice*)
Marcus L. Mintz *(*To Be Admitted *Pro Hac Vice*)
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, Illinois  60606
Telephone:  (312) 460-5000
Facsimile:   (312) 460-7000

*Attorneys for Plaintiffs Tornier, Inc. and*
*Wright Medical Technology, Inc.*

17

# EXHIBIT 1

DocuSign Envelope ID: EE319519-A49D-4470-A16B-2D88CA112A80

## INDEPENDENT SALES REPRESENTATIVE AGREEMENT

THIS INDEPENDENT SALES REPRESENTATIVE AGREEMENT (this "Agreement") is made and entered into effective as of July 2, 2018 (the "Effective Date") is (1) by and between **Tornier, Inc.**, an indirect subsidiary of Wright Medical Group N.V., a Delaware corporation having its principal place of business at located at 10801 Nesbitt Avenue South, Bloomington, MN 55437 ('Tornier"), **Caprock Orthopaedic Consultants, LLC** ("Representative"), and **Jared Gist**, an individual having his/her principal address of 4004 106th Lubbock, TX 79423 ("Guarantor"), and by and between **Wright Medical Technology, Inc.**, an indirect subsidiary of Wright Medical Group N.V., a Delaware corporation having its principal place of business at located at 1023 Cherry Road, Memphis, Tennessee 38117 ('Wright"), Representative, and Guarantor, (each Tornier, Wright, Representative, and Guarantor, a "Party" and collectively "the Parties").

Tornier shall be a party to this Agreement solely for purposes of the Tornier Products identified on Exhibit A attached hereto and Wright shall be a party to this Agreement solely for purposes of the Wright Products identified on Exhibit A attached hereto. Representative's contractual relationship with each of Tornier and Wright shall be separate and distinct and shall only be with respect to such Party's applicable Products. In no event shall Tornier or Wright be responsible for the other's obligations hereunder and in no event shall Representative look to Tornier or Wright for liability or recourse with respect to the acts or omissions of the other. The term "Company" as used in this Agreement shall refer to either Tornier or Wright acting in their individual capacity with the respect to their respective Products.

     A.    Company manufactures medical devices and related products (the "Product" or "Products").

     B.    Company desires to appoint Representative as its agent to sell the Products, and Representative desires to accept such appointment, subject to the terms and conditions of this Agreement.

     Accordingly, for good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

1.    Appointment.

     1.1    Scope. Company hereby appoints Representative, and Representative accepts such appointment, as Company's non-exclusive sales representative to market and sell the Products identified in Exhibit A to the specific accounts in the geographic areas listed in Exhibit A hereto (the "Territory"), upon the terms and conditions of this Agreement. Without the prior written approval of Company, Representative shall not (a) appoint any of its own agents to promote or sell the Products, or (b) solicit orders for the sale of or market or sell the Products outside the accounts within the Territory. Company expressly reserves the right to directly market and sell the Products in the Territory and/or to appoint other representatives in the Territory. Company reserves the right at any time to modify the geographic area and/or the accounts within the geographic area by giving written notice of such change to Representative.

     1.2    Non-competition.

     (a)    In consideration of the appointment by Company pursuant to Section 1.1, subject to any State law restrictions and Section 1.2(b), Representative and Guarantor

represent and warrant to Company that they do not (nor does any entity or person affiliated with it) currently represent or promote any lines or products that are competitive with any Product, and that they shall not (nor shall any entity or person affiliated with it) during the Term and for a period of one (1) year thereafter, directly or indirectly, represent, promote, sell or otherwise commercialize within the Territory any products that are the same or substantially similar to, or competitive with, the products (including Products) manufactured and/or sold by Company at any time or by which the sale of such product would reduce the opportunity for sale of any Product.  In addition, Representative and Guarantor represent that performance of all the terms of this Agreement and as a representative of Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by it in confidence or in trust prior to its engagement by Company, and Representative agrees not to disclose to Company any confidential or proprietary information or material belonging to any previous employers or other entities with whom Representative or Guarantor has been involved. Representative and Guarantor represent and warrant to Company that the execution, delivery, and performance of this Agreement will not conflict with, breach, cause a default under, or result in the termination of any contract, employment relationship, agreement, or understanding, oral or written, with any third party, including without limitation any noncompetition covenant to which or by which it is bound and that there are no other commitments or agreements that would prevent it from entering into this Agreement or performing its obligations under this Agreement. Representative and Guarantor further agree that it will not knowingly contract with or employ any entity or individual which contract or employment will conflict with, breach, cause a default under, or result in the wrongful termination of any contract, agreement, or understanding, oral or written, with any third party, including without limitation any noncompetition covenant to which or by which such individual or entity is bound. Representative agrees to indemnify, hold harmless and defend Company, its employees, officers and directors, against any causes of action, claims, suits, proceedings, damages and judgments arising out of any claim by any third party arising out of any alleged or actual misrepresentation or violation of these provisions.

(b)    In the event that Representative currently represents any lines or products that are competitive with any Product, Representative shall have sixty (60) days to cease such activity and comply with the requirements of Section 1.2(a).  In the event Representative fails to comply with the requirements of Section 1.2(a) within such sixty (60) day timeframe, Company, in its sole and absolute discretion, may terminate this Agreement or modify Representative's Territory or Products without liability or compensation therefor.  Notwithstanding the foregoing, the parties hereby agree that the Representative shall be allowed to carry the "Additional Products" listed on Exhibit A, even if such Additional Products may be considered competitive with any Product.

(c)    At the time of execution of this Agreement, Representative shall list on Exhibit A all noncompetitive products, and medical devices that Representative promotes, advertises, distributes, or sells as of the Effective Date, and any competitive products that the Company has agreed to allow the Representative to carry. During the Term of this Agreement, Representative agrees that it must notify Company of any additional products or medical devices it seeks to promote, sell, service or distribute, in writing, within 10 days prior to the execution of any such

DocuSign Envelope ID: EE319519-A49D-4470-A16B-2D88CA112A80

agreement to promote, sell, service or distribute, any product or medical device. Any additional medical products, devices, therapies and drugs deemed competitive by Company will be subject to the requirements of Section 1.2(a) and any additional medical products, devices, therapies and drugs deemed not competitive by Company will be added to Exhibit A.

1.3     Non-Solicitation.    The Representative and Guarantor acknowledge that the agreements and covenants contained in this Section 1.3 are essential to protect the value of the Company's, or any of its subsidiaries' or affiliates', business and assets and by his or her current representation with the Company and its subsidiaries, the Representative and Guarantor have obtained and will obtain such knowledge, contacts, know-how, training and experience and there is a substantial probability that such knowledge, know-how, contacts, training and experience could be used to the substantial advantage of a competitor of the Company or any of its subsidiaries or affiliates and to the Company's, or any of its subsidiaries' or affiliates', substantial detriment.    Therefore, the Representative and Guarantor agree that for the period commencing on the date of this Agreement and ending on the first anniversary of the termination of the Representative's Agreement hereunder (such period is hereinafter referred to as the "Restricted Period"), the Representative and Guarantor shall not whether for their or their own account or for the account of any other individual, partnership, firm, corporation or other business organization (other than the Company), directly or indirectly solicit, endeavor to entice away from the Company or any of its subsidiaries or affiliates, or otherwise directly interfere with the relationship of the Company or any of its subsidiaries or affiliates with (a) any person who, to the knowledge of the Representative or Guarantor, is employed by or otherwise engaged to perform services for the Company or any of its subsidiaries or affiliates (including, but not limited to, any independent sales representatives or organizations) or (b) who is, or was within the then most recent 12-month period, a customer, client or prospect of the Company, its predecessors or any of its subsidiaries or affiliates with whom or with which the Representative or Guarantor had contact during the one (1) year period prior to the termination of this Agreement.    The placement of any general classified or 'help wanted' advertisements and/or general solicitations to the public at large shall not constitute a violation of this Section 1.3 unless the Representative's name is contained in such advertisements or solicitations.    During the Restricted Period, the Representative will inform any new employer, prior to accepting employment, of the existence of this Agreement and provide such employer with a copy of this Agreement.

1.4     Representations.    Representative represents and warrants to Company that he has the authority to enter into this Agreement and that the execution, delivery and performance of this Agreement by Representative will not conflict with or infringe upon any contract or agreement to which he is a party or by which he is bound.

2.     Rights and Obligations of the Representative.

2.1     General Obligations of Representative.    Representative shall take all steps necessary and shall use its best efforts to further the promotion, marketing and sale of, and shall be responsible for training the customers in the proper use of, the Products in the Territory, including without limitation the following steps:

(a)     Promote the Products focusing specifically on the Company's Products identified in Exhibit A and disburse related marketing literature;

(b)     Provide sales support for other Company Products in cooperation with the other Company representatives within the Territory;

DocuSign Envelope ID: EE319519-A49D-4470-A16B-2D88CA112A80

(c) Assist with the processing of Product orders;

(d) Assist in the resolution of customer issues and problems;

(e) Consult with Company regarding Product applications and customer requirements;

(f) Take all reasonable steps necessary to ensure that the Products are used, applied and operated properly by customers;

(g) Follow up and provide feedback on leads send by Company to Representative.

(h) Comply with the terms of the Company's policies and procedures, as it may be amended from time to time. To the extent there is any conflict between the terms of the Company's policies and procedures and this Agreement, the terms of this Agreement shall control.

2.2 <u>Confidentiality</u>.  Representative acknowledges and agrees that all Company Information is confidential and proprietary to Company.  Representative shall not use any Company Information during the Term or thereafter for any purpose other than as permitted or required for performance by Representative under this Agreement.  Representative further agrees not to disclose or provide any Company Information to any third party.  For purposes of this Section 2.2, "<u>Company Information</u>" means all information, other than information in the public domain or expressly designated by Company as non-confidential, which is disclosed to Representative by Company or embodied in the Products and relating in any way to Company's manufacturing processes, markets, customers, pricing, patents, inventions, products, procedures, designs, plans, organization, employees or business in general.

2.3 <u>Discontinued Products</u>.  Company reserves the right, in its sole discretion, to alter the specifications or discontinue the manufacture or sale of any Product.

2.4 <u>Compliance with Laws; Code of Conduct</u>.  With respect to the sale of both Tornier Products and Wright Products, Representative and employees, owners, agents, sales representatives and independent contractors of Representative, shall comply with all policies of Wright, including, but not limited to, the Wright Code of Business Conduct ("Code of Conduct"), as it may be amended from time to time, and shall comply with all applicable local, state, and federal laws, including, but not limited to fraud and abuse laws.  In the event Representative or employees, owners, agents, and representatives of Representative solicit sales of other product lines, all activities related to these product lines and particularly any interaction with health care providers shall comply with the Code of Conduct.

3. <u>Orders for Products</u>.

3.1 <u>Purchase Orders</u>.  All customer purchase orders for the purchase of Products shall be submitted to Company and are subject to acceptance by Company, in its sole discretion.  In no event shall Representative issue any acknowledgements of orders or invoices to customers on behalf of Company.

3.2 <u>Prices and Payment for Products</u>.  All price quotations and sales to customers for Products shall be at the prices, terms and conditions established by Company.  Company shall have the right, in its sole discretion, to accept or reject any and all orders from customers.

3.3   <u>Commissions and Expenses</u>.  Company shall pay Representative a commission for the invoiced sale of Products to the assigned accounts within Territory as set forth in <u>Exhibit B</u> the Net Sales Price (as defined below) of all Products sold to customers in the Territory with respect to orders that result from the active sales efforts by Representative.  For purposes of this Agreement, "<u>Net Sales Price</u>" means the gross sales price of the Products sold to customers in the Territory, less charges for group purchasing organizations or other national accounts including but not limited to administration fees, service fees and deductions, or similar fees, shipping, handling, freight, taxes, C.O.D. charges, insurance, tariffs and duties, cash and trade discounts, rebates, charge back payments to managed healthcare organizations, amounts allowed or credited for returns, uncollected or uncollectable amounts, services, and the like.  Representative shall bear the entire cost and expense of conducting his business including, but not limited to, office and communications costs, travel and advertising expenses, and similar expenses.

3.4   <u>Commission Charge Back</u>.  Company shall have the absolute right to set cash discounts, to make allowances and adjustments, to accept returns from its customers, and, at its election, to write off as bad debts overdue customer accounts as it deems advisable in its discretion.  In each such case, Company shall charge back to Representative any commission advance previously paid or credited to it with respect to such cash discounts, allowances, adjustments, returns or bad debts.  Representative also agrees to accept charges or payment of damages or remedies to accounts for: (i) pricing arrangements (or side deals) communicated to an account by a Representative or any person or entity associated with Representative but not pre-approved by Company; (ii) lost, damaged or missing inventory; and (iii) failure to comply with Company's communicated policies.  Company may offset and deduct from any sums advanced to the Representative any sums validly owed by the Representative to Company, including, but not limited to, overpaid sales commissions from prior periods, agreed upon shared expenses, loan payments and lost inventory; it being understood that any commissions paid to Representative shall not be deemed or considered "earned" until any such adjustments, allowances or chargebacks accounted for and executed as determined by the Company in its sole discretion..

3.5   <u>Commission Payments</u>.  Payment of all commissions due to Representative shall be accompanied by a commission statement setting forth Company's computation of such commissions.  Company shall pay all commissions due to Representative in the calendar month following the month in which Company invoices the customers for the Products to which such commissions relate.

3.6   <u>Sales Quotas</u>.  Representative shall secure orders that are submitted to the Company in accordance with this Agreement for the amount of the Net Sales of Products within each Product segment, Field and Territory identified as having a quota commitment and set forth in <u>Exhibit C</u> attached hereto (each a "Quota Commitment").  Separate Quota Commitments may be designated for each identified Territory and by Products and Fields.  Each Quota Commitment shall be determined by the Company and delivered to Representative within thirty (30) days of the end of each fiscal year, or as may be delivered to Representative by the Company from time to time if there are newly introduced Products or in the event a Product, Field or Territory changes.

DocuSign Envelope ID: EE319519-A49D-4470-A16B-2D88CA112A80

4.      <u>Term and Termination</u>.

4.1    <u>Term</u>.  This Agreement shall be effective as of the date first written above and shall continue until the earlier of **June 30, 2019** or the date on which it is terminated in accordance with Section 4.2 (the "<u>Term</u>").

4.2    <u>Termination</u>.  Either party may terminate this Agreement for any reason upon 30 days prior written notice to the other party.  In addition, if, during any calendar quarter during the Term, Representative fails to achieve the Minimum Quota, Company shall have the right to terminate this Agreement immediately upon written notice to Representative by certified mail.

4.3    <u>Rights and Obligations on Termination</u>.  In the event of termination of this Agreement for any reason, the parties shall have the following rights and obligations:

(a)     Company shall be obligated to make payment of all commissions due to Representative for sales made prior to the effective date of termination of this Agreement and for which Company receives full payment in accordance with Section 3.3.

(b)     Within 30 days of the date of termination, Representative shall furnish to Company a list of all Representative's active sales leads, current customers and the place of destination of all Products sold or distributed in the immediately preceding 12 months.

(c)     Representative's obligations pursuant to Sections 1.2, 1.3, 2.2, 4.4, and 4.5 shall survive termination of this Agreement.

4.4    <u>Cooperation</u>.  Upon termination of this Agreement, Representative shall cooperate fully with Company in order to effect an orderly transition of Representative's responsibilities to Company.

4.5    <u>No Compensation</u>.  In the event either party terminates this Agreement for any reason in accordance with the terms hereof, the parties hereby agree that, subject to the provisions of Sections 3.2 and 4.4 and without prejudice to any other remedies which either party may have in respect of any breach of this Agreement, neither party shall be entitled to any compensation or like payment from the other as a result of such termination.

5.      <u>Miscellaneous</u>.

5.1    <u>Independent Contractor</u>.  Representative is an independent contractor and not an employee of Company for any purpose.  Representative shall have no right, power or authority in any way to bind Company to the fulfillment of any condition, contract or obligation, express or implied, between Company and any third party. Company shall not be liable for any acts by Representative resulting in liability, unless such liability is specifically assumed by Company, or for any legal actions or claims of any nature instituted against Representative.

5.2    <u>Entire Agreement</u>.   This Agreement, including any exhibits or schedules referenced herein, constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes all previous proposals, oral or written, and all prior negotiations, conversations or discussions between the parties related to this Agreement.   Representative acknowledges that it has not been induced to enter into this Agreement by any representations or statements, oral or written, not expressly contained herein.

DocuSign Envelope ID: EE319519-A49D-4470-A16B-2D88CA112A80

5.3     <u>Amendment</u>.  This Agreement may not be deemed or construed to be modified or amended in whole or part, other than by written amendment signed by the parties hereto.

5.4     <u>Governing Law</u>.  This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of Minnesota without regard to Minnesota conflicts of law principles.

5.5     <u>Guaranty</u>.  Guarantor desire Company to enter into this Agreement with Representatives and, as a condition of entering this Agreement, Company requires Guarantor to guarantee in full the obligations of Representatives to Company under this Agreement. Guarantor unconditionally, absolutely, and irrevocably guarantees the payment and performance of, and agrees to pay and perform as primary obligor, all liabilities, obligations, covenants, terms, conditions, and duties imposed upon Representative under the terms of this Agreement as if Guarantor had executed the Agreement as Representative.  This is a continuing Guaranty and shall apply to any and all Agreement amendments, extensions, renewals, and modifications whatsoever.  Guarantor expressly consents to any extension of time, leniency, modification, waiver, forbearance, or any change which may be made in any term and condition of the Agreement, and no such change, modification, extension, waiver, or forbearance, shall release Guarantor from any liability or obligation hereby incurred or assumed.  Guarantor hereby expressly waives notice of acceptance of this Guaranty, promptness, diligence, any demand or notice of any kind regarding the obligations to be performed hereunder or proceedings in connection with the Agreement to enforce the rights of Company under this Agreement. Guarantor agrees that any and all judgments resulting from liabilities, obligations, and duties imposed upon Representative under the terms of the Agreement shall be binding upon Guarantor. The liabilities of Guarantor under this Guaranty are direct obligations, and Guarantor hereby waives any requirement that Company resort to or exhaust any right to take any action against Representative or any other person or entity.

DocuSign Envelope ID: EE319519-A49D-4470-A16B-2D88CA112A80

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

**TORNIER, INC.**

Vincent Fath
_____
*(Name)*

*Vincent Fath*
_____
*(Signature)*

8/31/2018
_____
*(Date)*

**CAPROCK ORTHOPAEDIC CONSULTANTS**

Jared Gist
_____
*(Officer's Name)*

_____
*(Officer's Signature)*

8/30/2018 12:17:25 PM PDT
_____
*(Date)*

**WRIGHT MEDICAL TECHNOLOGY, INC.**

Brent Melancon
_____
*(Name)*

*Brent Melancon*
_____
*(Signature)*

8/31/2018
_____
*(Date)*

**GUARANTOR – JARED GIST**

Jared Gist
_____
*(Name)*

_____
*(Signature)*

8/30/2018 12:17:25 PM PDT
_____
*(Date)*

DocuSign Envelope ID: EE319519-A49D-4470-A16B-2D88CA112A80

EXHIBIT A
PRODUCTS, FIELDS AND TERRITORY

This Exhibit is incorporated by reference into and made a part of the Independent Sales Representative Agreement (the "Agreement") between Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

| Product | Field[1] | Territory |
|---|---|---|
| Upper Extremity Arthroplasty Products, Upper Extremity Other Products, Sports Medicine, and Biologics | Upper Extremity Customers | Dr. Alejandro Verdugo and Dr. Karl Pankratz |

List of Additional Products represented by Representative: [ Smith and Nephew ]

**Definitions:**

*For purposes of the Products, the Product Categories are defined as follows:*

"Upper Extremity Arthroplasty Products"

    a. Aequalis Shoulder Systems (excluding the Aequalis Nail) (Tornier Product)
    b. Affiniti Shoulder System (Tornier Product)
    c. Ascend Shoulder System (Tornier Product)
    d. Simpliciti Shoulder System (Tornier Product)
    e. Latitude and Latitude EV Total Elbow (Tornier Product)
    f. Tornier Blueprint 3D Planning Software + PSI (Tornier Product)
    g. Tornier Approach (Tornier Product)

"Upper Extremity Other Products"

    a. CoverLoc Volar Plate System (Tornier Product)
    b. Intrafocal Pin Plate System (Tornier Product)
    c. RHS Radial Head Prosthesis (Tornier Product)
    d. CMI Carpometacarpal Implant (Tornier Product)
    e. Aequalis IM Nail (Tornier Product)
    f. OrthoHelix MaxLock Clavicle (Tornier Product)
    g. OrthoHelix DRLock and DRLock Extreme (Tornier Product)
    h. Evolve Plating System (Wright Product)
    i. Evolve Modular Radial Head System (Wright Product)
    j. Evolve Radial Head Plate (Wright Product)
    k. Micronail - Intramedullary Distal Radius Fixation System (Wright Product)
    l. Orthosphere (Wright Product)
    m. Rayhack (Wright Product)
    n. Swanson finger implants (Wright Product)
    o. Tie-In - Trapezium Implant (Wright Product)
    p. Fuseforce (Wright Product)
    q. Micronail (Wright Product)

"Sports Medicine"

    a.  Piton Implants (Tornier Product)
    b.  Insite FT Suture Implants (Tornier Product)
    c.  Force Fiber Suture (Tornier Product)
    d.  Phantom Fiber Suture (Tornier Product)
    e.  ArthroTunneler and TunnelPro Systems (Tornier Product)
    f.  Duo Suture Implants (Tornier Product)
    g.  ArthroPass Suture Passer (Tornier Product)
    h.  Nice Loop Suture (Tornier Product)

"Biologics Products"

    a.  Conexa (Tornier Product)
    b.  SoloStitch (Tornier Product)
    c.  BioFiber (Tornier Product)
    d.  QuickCell (Tornier Product)
    e.  Actishield (Wright Product)
    f.  Allomatrix (Wright Product)
    g.  Allopure (Wright Product)
    h.  Augmatrix (Wright Product)
    i.  Fusionflex (Wright Product)
    j.  Graftjacket (Wright Product)
    k.  Ignite (Wright Product)
    l.  MIIG (Wright Product)
    m. Prodense (Wright Product)
    n.  Pro-Stim (Wright Product)
    o.  Viaflow (Wright Product)

EXHIBIT B
COMMISSIONS

This Exhibit is incorporated by reference into and made a part of the Independent Sales Representative Agreement (the "Agreement") between Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

| *Upper Extremity Arthroplasty Products, Upper Extremity Other Products, and Sports Medicine* | |
|---|---|
| Flat commission on all sales | 8% |
| Management Objective [1] | 2% |
| Back to $1, upon achieving aggregate quarterly Upper Extremity Quota Commitment | 2% |

| *Biologics* | |
|---|---|
| Flat commission on all sales | 13% |
| Back to $1, upon achieving aggregate annual Biologics Extremity Quota Commitment | 3% |

These commission rates may be changed at any time, at the sole discretion of the Company.

[1]Company may modify the commission rate and/or related management objective at any time in its sole discretion.

EXHIBIT C

## FISCAL YEAR 2018 QUOTA COMMITMENT

This Exhibit is incorporated by reference into and made a part of the Independent Sales Representative Agreement (the "Agreement") between Company and Representative (as defined in the Agreement). Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

2018 Quotas will be:

| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| **Upper Extremity Quota Commitment*** | | | $67,136 | $82,864 |

*The Products included in the Upper Extremity Quota Commitment are those listed in Exhibit A under Upper Extremity Arthroplasty Products, Upper Extremity Other Products and Sports Medicine.

2018 Biologics Quotas will be:

| | Q1 | Q2 | Q3 | Q4 |
|---|---|---|---|---|
| **Biologics Quota Commitment**** | | | $6,600 | $6,600 |

**The Products included in the Biologics Quota Commitment are those listed in Exhibit A under Biologics Products.

**DocuSign**
S E C U R E D

## Certificate Of Completion

Envelope Id: EE319519A49D4470A16B2D88CA112A80                                         Status: Completed
Subject: Please DocuSign: Gist, Jared 2018-05-24 Tornier-Wright ISR Agreement (v2).pdf
Source Envelope:
Document Pages: 12                            Signatures: 4                Envelope Originator:
Certificate Pages: 5                          Initials: 0                  Nicole Solly
AutoNav: Enabled                                                          10801 Nesbitt Ave South
EnvelopeId Stamping: Enabled                                             Minneapolis, MN  55437
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                        ussalesoperations@wright.com
                                                                        IP Address: 74.202.242.54

## Record Tracking

Status: Original                     Holder: Nicole Solly                     Location: DocuSign
        8/30/2018 12:04:35 PM                ussalesoperations@wright.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jared Gist<br>jaredgist@gmail.com<br>Security Level: Email, Account Authentication<br>(None) | *[signature]*<br>1EFCAE790ECF431...<br><br>Signature Adoption: Uploaded Signature Image<br>Using IP Address: 107.77.201.231<br>Signed using mobile | Sent: 8/30/2018 12:14:20 PM<br>Viewed: 8/30/2018 12:17:13 PM<br>Signed: 8/30/2018 12:17:25 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 8/30/2018 12:17:13 PM<br>    ID: 9c9d7add-c1cb-4137-9268-802130663468 | | |
| Vincent Fath<br>Vincent.Fath@wright.com<br>Security Level: Email, Account Authentication<br>(None) | *[signature]*<br>A352FC0BCFD7466...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 69.249.252.210 | Sent: 8/30/2018 12:17:27 PM<br>Viewed: 8/31/2018 8:25:06 AM<br>Signed: 8/31/2018 8:25:13 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 8/31/2018 8:25:06 AM<br>    ID: 43300e6f-c86c-43f9-8c76-cd6b25251933 | | |
| Brent Melancon<br>Brent.Melancon@wright.com<br>Security Level: Email, Account Authentication<br>(None) | *[signature]*<br>0E719138EF774DD...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 69.174.87.68 | Sent: 8/31/2018 8:25:15 AM<br>Viewed: 8/31/2018 8:58:16 AM<br>Signed: 8/31/2018 8:58:43 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 8/31/2018 8:57:22 AM<br>    ID: 903ac024-8ce7-48b2-9ec4-030d48334c51 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/31/2018 8:25:15 AM |
| Certified Delivered | Security Checked | 8/31/2018 8:58:16 AM |
| Signing Complete | Security Checked | 8/31/2018 8:58:43 AM |
| Completed | Security Checked | 8/31/2018 8:58:43 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 8/28/2018 11:20:10 AM
Parties agreed to: Jared Gist, Vincent Fath, Brent Melancon

**CONSUMER DISCLOSURE**

From time to time, Wright (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

**Getting paper copies**

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

**Withdrawing your consent**

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

**Consequences of changing your mind**

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

**All notices and disclosures will be sent to you electronically**

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wright:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ussalesoperations@wright.com

**To advise Wright of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at ussalesoperations@wright.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Wright**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to ussalesoperations@wright.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Wright**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

> ii. send us an e-mail to ussalesoperations@wright.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |

| Enabled Security Settings: | Allow per session cookies |
|---|---|

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Wright as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Wright during the course of my relationship with you.



## Certificate Of Completion

Envelope Id: EE319519A49D4470A16B2D88CA112A80                                          Status: Completed
Subject: Please DocuSign: Gist, Jared 2018-05-24 Tornier-Wright ISR Agreement (v2).pdf
Source Envelope:
Document Pages: 12                          Signatures: 4                              Envelope Originator:
Certificate Pages: 5                        Initials: 0                                Nicole Solly
AutoNav: Enabled                                                                       10801 Nesbitt Ave South
EnvelopeId Stamping: Enabled                                                           Minneapolis, MN  55437
Time Zone: (UTC-08:00) Pacific Time (US & Canada)                                      ussalesoperations@wright.com
                                                                                       IP Address: 74.202.242.54

## Record Tracking

Status: Original                            Holder: Nicole Solly                       Location: DocuSign
        8/30/2018 12:04:35 PM                       ussalesoperations@wright.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| Jared Gist<br>jaredgist@gmail.com<br>Security Level: Email, Account Authentication (None) | Signature Adoption: Uploaded Signature Image<br>Using IP Address: 107.77.201.231<br>Signed using mobile | Sent: 8/30/2018 12:14:20 PM<br>Viewed: 8/30/2018 12:17:13 PM<br>Signed: 8/30/2018 12:17:25 PM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 8/30/2018 12:17:13 PM<br>    ID: 9c9d7add-c1cb-4137-9268-802130663468 | | |
| Vincent Fath<br>Vincent.Fath@wright.com<br>Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style<br>Using IP Address: 69.249.252.210 | Sent: 8/30/2018 12:17:27 PM<br>Viewed: 8/31/2018 8:25:06 AM<br>Signed: 8/31/2018 8:25:13 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 8/31/2018 8:25:06 AM<br>    ID: 43300e6f-c86c-43f9-8c76-cd6b25251933 | | |
| Brent Melancon<br>Brent.Melancon@wright.com<br>Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style<br>Using IP Address: 69.174.87.68 | Sent: 8/31/2018 8:25:15 AM<br>Viewed: 8/31/2018 8:58:16 AM<br>Signed: 8/31/2018 8:58:43 AM |
| **Electronic Record and Signature Disclosure:**<br>    Accepted: 8/31/2018 8:57:22 AM<br>    ID: 903ac024-8ce7-48b2-9ec4-030d48334c51 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 8/31/2018 8:25:15 AM |
| Certified Delivered | Security Checked | 8/31/2018 8:58:16 AM |
| Signing Complete | Security Checked | 8/31/2018 8:58:43 AM |
| Completed | Security Checked | 8/31/2018 8:58:43 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## CONSUMER DISCLOSURE

From time to time, Wright (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign, Inc. (DocuSign) electronic signing system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to these terms and conditions, please confirm your agreement by clicking the 'I agree' button at the bottom of this document.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after signing session and, if you elect to create a DocuSign signer account, you may access them for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. To indicate to us that you are changing your mind, you must withdraw your consent using the DocuSign 'Withdraw Consent' form on the signing page of a DocuSign envelope instead of signing it. This will indicate to us that you have withdrawn your consent to receive required notices and disclosures electronically from us and you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Wright:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: ussalesoperations@wright.com

**To advise Wright of your new e-mail address**

To let us know of a change in your e-mail address where we should send notices and disclosures electronically to you, you must send an email message to us at ussalesoperations@wright.com and in the body of such request you must state: your previous e-mail address, your new e-mail address.  We do not require any other information from you to change your email address..

In addition, you must notify DocuSign, Inc. to arrange for your new email address to be reflected in your DocuSign account by following the process for changing e-mail in the DocuSign system.

**To request paper copies from Wright**
To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an e-mail to ussalesoperations@wright.com and in the body of such request you must state your e-mail address, full name, US Postal address, and telephone number. We will bill you for any fees at that time, if any.
**To withdraw your consent with Wright**

To inform us that you no longer want to receive future notices and disclosures in electronic format you may:

> i. decline to sign a document from within your DocuSign session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

> ii. send us an e-mail to ussalesoperations@wright.com and in the body of such request you must state your e-mail, full name, US Postal Address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

| Operating Systems: | Windows® 2000, Windows® XP, Windows Vista®; Mac OS® X |
|---|---|
| Browsers: | Final release versions of Internet Explorer® 6.0 or above (Windows only); Mozilla Firefox 2.0 or above (Windows and Mac); Safari™ 3.0 or above (Mac only) |
| PDF Reader: | Acrobat® or similar software may be required to view and print PDF files |
| Screen Resolution: | 800 x 600 minimum |

| Enabled Security Settings: | Allow per session cookies |
|---|---|

** These minimum requirements are subject to change. If these requirements change, you will be asked to re-accept the disclosure. Pre-release (e.g. beta) versions of operating systems and browsers are not supported.

**Acknowledging your access and consent to receive materials electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please verify that you were able to read this electronic disclosure and that you also were able to print on paper or electronically save this page for your future reference and access or that you were able to e-mail this disclosure and consent to an address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format on the terms and conditions described above, please let us know by clicking the 'I agree' button below.

By checking the 'I agree' box, I confirm that:

- I can access and read this Electronic CONSENT TO ELECTRONIC RECEIPT OF ELECTRONIC CONSUMER DISCLOSURES document; and
- I can print on paper the disclosure or save or send the disclosure to a place where I can print it, for future reference and access; and
- Until or unless I notify Wright as described above, I consent to receive from exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to me by Wright during the course of my relationship with you.

# EXHIBIT 2

DocuSign Envelope ID: 715321AC-2C53-4C46-8737-F0C6AEB91732

## SECOND AMENDMENT
## TO INDEPENDENT SALES REPRESENTATIVE AGREEMENT
## BETWEEN
## TORNIER, WRIGHT AND CAPROCK ORTHOPEDIC CONSULTANTS, LLC

This Second Amendment to the Independent Sales Representative Agreement ("Amendment") is dated effective December 30, 2019 (the "Amendment Effective Date"), is (i) by and between **Tornier, Inc.**, an indirect subsidiary of Wright Medical Group N.V., and Delaware Corporation ("Tornier"), **Caprock Orthopaedic Consultants, LLC** ("Representative"), and **Jared Gist**, an individual having his/her principal address of 4004 106th Lubbock, TX 79423 ("Guarantor") (ii) by and between **Wright Medical Technology, Inc.**, an indirect subsidiary of Wright Medical Group N.V., and Delaware corporation whose address and principal place of business is 1023 Cherry Road, Memphis, Tennessee 38117 ("Wright"), and Representative, and (iii) an amendment to that certain Independent Sales Representative Agreement dated effective as of July 02, 2018, as amended July 01, 2019 (collectively, the "Agreement"), between Company and Representative (capitalized terms used and not defined herein shall have the meanings assigned to them in the Agreement).

### RECITALS

WHEREAS, Company and Representative previously executed the Agreement pursuant to which Representative was appointed Company's sales representative for the Products in the Territory; and

WHEREAS, the parties executed First Amendment to extend the Term and modify Products and Commissions

WHEREAS, the parties now wish to amend the Agreement to extend the Term and modify Products and Commissions.

### AGREEMENT

Now therefore, in consideration of the mutual covenants and agreements hereinafter provided, the parties hereby agree that the terms of this Amendment shall be incorporated in and be a part of the Agreement.

1.  <u>Term.</u>  Section 4.1 to the Agreement is deleted in its entirety and replaced with the following:

    "4.1 <u>Term</u>.  This Agreement shall be effective as of the date first written above and shall continue until the earlier of December 27, 2020 or the date on which it is terminated in accordance with Section 4.2 (the "Term")."

2.  <u>Exhibits.</u>  Exhibit A and Exhibit B to the Agreement are deleted and replaced in their entirety with a new Exhibit A and Exhibit B, respectively, attached hereto.

3.  <u>Entire Agreement</u>.  The Agreement, as amended and supplemented by this Amendment, sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements between the parties relative to such subject matter.  All other terms of the Agreement remain in full force and effect.

4.  <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts, each of which shall be deemed an original and all of which shall together constitute one and the same instrument.

*[Remainder of Page Intentionally Left Blank]*

1

As evidence of the parties' agreement with the terms and conditions set forth above, the parties have caused this Amendment to be signed by an authorized person.

**TORNIER, INC.**

Vincent Fath
_____
*(Name)*

_____
*(Signature)*

7/14/2020
_____
*(Date)*

**CAPROCK ORTHOPAEDIC CONSULTANTS, LLC**

Jared Gist
_____
*(Officer's Name)*

_____
*(Officer's Signature)*

7/14/2020
_____
*(Date)*

**WRIGHT MEDICAL TECHNOLOGY, INC.**

Taylor Foreman
_____
*(Name)*

_____
*(Signature)*

7/15/2020
_____
*(Date)*

**GUARANTOR – JARED GIST**

Jared Gist
_____
*(Name)*

_____
*(Signature)*

7/14/2020
_____
*(Date)*

DocuSign Envelope ID: 715321AC-2C53-4C46-8737-F0C6AEB91732

EXHIBIT A
PRODUCTS, FIELDS AND TERRITORY

This Exhibit is incorporated by reference into and made a part of the Independent Sales Representative Agreement (the "Agreement") between Company and Representative (as defined in the Agreement).  Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

| Product* | Field[1] | Territory |
|---|---|---|
| All Tornier and Wright Upper Extremity Products, Tornier Sports Medicine, and Tornier and Wright Biologics Products (except Augment and Augment Injectable) | Upper Extremity Customers | The following doctors in the state of Texas:  Michael Farr, Alejandro Verdugo, Stephen Flores, Atul Joshi, Todd Bradshaw and Karl Pankratz |

*Products are as designated by the Company, in Company's sole and absolute discretion.

[1]In the case of a dispute as to which Field a specific customer is defined as, or if there is uncertainty within a Territory as to the sales to a particular Field, Company will resolve the dispute and define the Field in its sole and absolute discretion.

List of Additional Products represented by Representative:  **Smith & Nephew**

EXHIBIT B
COMMISSIONS

This Exhibit is incorporated by reference into and made a part of the Independent Sales Representative Agreement (the "Agreement") between Company and Representative (as defined in the Agreement).  Any capitalized terms not defined in this Exhibit shall have the meaning set forth in the Agreement. Should a conflict arise between this Exhibit and the Agreement, the provisions of this Exhibit shall control.

| *Tornier and Wright Upper Extremity Products (Including Sports Medicine)* | |
|---|---|
| Flat commission on all sales | 10% |
| Management Objective [1] | 2% |
| Back to $1, upon achieving aggregate quarterly Upper Extremity Quota Commitment | 3% |

| *Tornier and Wright Biologics* | |
|---|---|
| Flat commission on all sales | 13% |
| Back to $1, upon achieving aggregate quarterly Biologics Quota Commitment | 3% |

These commission rates may be changed at any time, at the sole discretion of the Company.

[1]Company may modify the commission rate and/or related management objective at any time in its sole discretion.

# EXHIBIT 3



10801 Nesbitt Avenue South
Bloomington, MN 55437
USA

952 426 7600
888 867 6437
wright.com



January 18, 2021

**VIA ELECTRONIC MAIL**

Mr. Jared Gist
Caprock Orthopaedic Consultants, LLC
4004 106th
Lubbock, TX  79423
jaredgist@gmail.com

RE:    Independent Sales Representative Agreement

Dear Mr. Gist:

As you are aware, you have a number of post-termination obligations pursuant to your July 2, 2018 Independent Sales Representative Agreement, as amended, with Tornier, Inc. and Wright Medical Technology, Inc. (the "Agreement") which recently terminated.  I have attached a copy of the Agreement including the most recent amendment to the Agreement.  Tornier and Wright are collectively referred to as the "Company" in this letter.

The Company understands that you may have taken a position with Exactech.  You are hereby reminded that Paragraphs 1.2 and 1.3 of the Agreement set forth the following restrictions:

- <u>Non-Competition</u>.  Representative and Guarantor represent and warrant to Company that . . . they shall not (nor shall any entity or person affiliated with it) during the Term and for a period of one (1) year thereafter, directly or indirectly, represent, promote, sell or otherwise commercialize within the Territory any products that are the same or substantially similar to, or competitive with, the products (including Products) manufactured and/or sold by Company at any time or by which the sale of such product would reduce the opportunity for sale of any Product. In addition, Representative and Guarantor represent that performance of all the terms of this Agreement and as a representative of Company does not and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by it in confidence or in trust prior to its engagement by Company, and Representative agrees not to disclose to Company any confidential or proprietary information or material belonging to any previous employers or other entities with whom Representative or Guarantor has been involved.

- <u>Non-Solicitation</u>. The Representative and Guarantor acknowledge that the agreements and covenants contained in this Section 1.3 are essential to protect the value of the Company's, or any of its subsidiaries' or affiliates' business and assets and by his or her current representation with the Company and its subsidiaries, the Representative and Guarantor have obtained and will obtain such knowledge, contacts, know-how, training and

experience and there is a substantial probability that such knowledge, know-how, contacts, training and experience could be used to the substantial advantage of a competitor of the Company or any of its subsidiaries or affiliates and to the Company's, or any of its subsidiaries' or affiliates' substantial detriment. Therefore, the Representative and Guarantor agree that for the period commencing on the date of this Agreement and ending on the first anniversary of the termination of the Representative's Agreement hereunder (such period is hereinafter referred to as the "Restricted Period"), the Representative and Guarantor shall not whether for their or their own account or for the account of any other individual, partnership, firm, corporation or other business organization (other than the Company), directly or indirectly solicit, endeavor to entice away from the Company or any of its subsidiaries or affiliates, or otherwise directly interfere with the relationship of the Company or any of its subsidiaries or affiliates with (a) any person who, to the knowledge of the Representative or Guarantor, is employed by or otherwise engaged to perform services for the Company or any of its subsidiaries or affiliates (including, but not limited to, any independent sales representatives or organizations) or (b) who is, or was within the then most recent 12-month period, a customer, client or prospect of the Company, its predecessors or any of its subsidiaries or affiliates with whom or with which the Representative or Guarantor had contact during the one (1) year period prior to the termination of this Agreement.

Your "Territory" is defined as the following doctors:   Michael Farr, Alejandro Verdugo, Stephen Flores, Atul Joshi, Todd Bradshaw and Karl Pankratz. Your non-solicitation obligation extends to any customer, client or prospect of the Company you had contact with during the year prior to termination of the Agreement.

With respect to your legal obligation not to use or disclose to others any of Wright's Confidential Information, you should be aware that any use or disclosure of Confidential Information may subject you to civil and criminal liabilities under various federal and state laws that prohibit the misappropriation and theft of trade secrets.

The Company takes your contractual obligations seriously and will vigorously protect its legal rights and interests.  We anticipate that you will honor the terms of the above-identified agreement moving forward.  We are also placing Exactech on notice of these obligations by copy of this letter.  Should the Company determine that you have breached or in the future breach the Non-Compete, Non-Solicitation or Confidentiality provisions of the Agreement or otherwise engage in improper conduct, the Company will pursue whatever legal recourse is necessary to enforce it and to protect its rights.

If you or Exactech have any questions about this letter or your legal obligations under the Agreement, please direct them to me. The best number to reach me is (901) 618-3244 or by email at thomas.mcallister@wright.com.

Sincerely,

Tom McAllister
Division Counsel, Trauma & Extremities


Attachment



cc:    Donna Edwards, General Counsel, Exactech (via e-mail: donna.edwards@exac.com)
        Donnie Durham
        Brian Elias

# EXHIBIT 4



10801 Nesbitt Avenue South
Bloomington, MN 55437
USA

952 426 7600
888 867 6437
wright.com

February 9, 2021

**VIA ELECTRONIC MAIL**

Mr. Jared Gist
Caprock Orthopaedic Consultants, LLC
4004 106th
Lubbock, TX  79423
jaredgist@gmail.com

RE:     Independent Sales Representative Agreement

Dear Mr. Gist:

I am following up on my letter from last month in which I reminded you of your post-termination obligations pursuant to your July 2, 2018 Independent Sales Representative Agreement, as amended, with Tornier, Inc. and Wright Medical Technology, Inc. (the "Agreement").  Despite the clear restrictions on your conduct articulated in the Agreement and despite my reminder about those restrictions, Wright Medical Technology, Inc. and Tornier, Inc. (collectively the "Company") are aware of behavior that violates these non-compete and non-solicitation obligations.

Specifically, we have received reports of your unlawful solicitation of Dr. Panskratz, Dr. Campbell and Dr. Flores on behalf of Exactech in connection with Exactech's GPS Glenoid System. You were also observed participating in  a lab held in Lubbock, Texas in which we have reason to believe you solicited the sale of the Exactech shoulder product to customers of the Company with whom you had engaged with in the year prior to the termination of your agreement  This conduct violates the contractual obligations owed to the Company and the Company demands that you immediately cease engaging in any and all behavior that violates the post-termination non-compete, non-solicit and confidentiality restrictions of the Agreement.

The Company demands that you provide written assurances stating that you acknowledge and intend to abide by the post-termination restrictions in the Agreement and that you will cease and desist from conduct that violates the non-competition and non-solicitation obligations of the Agreement.  Accordingly, please respond to this letter no later than close of business on Wednesday, February 17, 2021 with those written assurances and a certification that you and Exactech will honor the restrictions contained in the Agreement.

The Company takes your contractual obligations seriously and will vigorously protect its legal rights and interests.  Should the Company determine that you have breached or in the future breach the Non-Compete, Non-Solicitation or Confidentiality provisions of the Agreement or otherwise engage in improper conduct, the Company will pursue whatever legal recourse is necessary to enforce it and to protect its rights which includes any claims it may have for tortious interference with the Company's contractual rights by Exactech.

If you or Exactech have any questions about this letter or your legal obligations under the Agreement, please direct them to me. The best number to reach me is (901) 618-3244 or by email at thomas.mcallister@wright.com.

Sincerely,

Tom McAllister
Division Counsel, Trauma & Extremities

cc:    Donna Edwards, General Counsel, Exactech (via e-mail: donna.edwards@exac.com)
       Donnie Durham
       Brian Elias

# EXHIBIT 5

**Mintz, Marcus L.**

| | |
|---|---|
| **From:** | Jared Gist <jaredgist@gmail.com> |
| **Sent:** | Friday, February 12, 2021 5:55 PM |
| **To:** | McAllister, Tom |
| **Subject:** | [EXTERNAL]Re: Please see attached correspondence |

I understand my contract and I have and also intend to continue to abide by it.

Also, I contacted salesOps 2/11 myself and also on another email from my manager 2/12 about my paycheck. I have not heard back. My 2020 growth incentive bonus has not been paid. My percentage payout for January is incorrect.  I also had physicians for January that were not paid to myself. There were also some invoices not closed out in time for February paychecks that I will need to be paid on. I intend and indeed will follow the letter of my contract. I hope we can resolve all of the outstanding payments due to myself in a timely manner.

If Tornier/Wright wants to forgo their end of my contracted payments, incorrect percentages, payment of certain surgeons, bonuses owed,
etc. I will accept under the conditions that I would like a letter from you that there will be no enforcement of my non compete as wright/Tornier is not holding up their end of my contract. I had a great time at Wright/Tornier and am upset that due to the Stryker buyout I can no longer represent this product line. I feel we can both mutually agree to separate with a simple letter and each agree to go our own ways. I would be willing to do so if Wright/Tornier agrees.

I wanted to bring all of this to your attention as I have not reached a very timely response of my payments in the past.

Thank you for your time in sending me this information.

Best regards,

Jared Gist

On Feb 9, 2021, at 4:42 PM, McAllister, Tom <Thomas.McAllister@wright.com> wrote:

<image003.png>

**TOM MCALLISTER**
Division Counsel, Trauma & Extremities
1023 Cherry Road  |  Memphis, TN 38117
Office: 901. 290.5658   |  Mobile: 901. 618.3244   |  Fax: 901.867.4195
thomas.mcallister@wright.com  |   www.wright.com [wright.com]

<Letter re Post-Term Restrictions (tlm 2-9-20).pdf>

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

1

# EXHIBIT 6

# Seyfarth

**Seyfarth Shaw LLP**
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
**T** (312) 460-5000
**F** (312) 460-7000

mwexler@seyfarth.com
T (312) 460-5559

www.seyfarth.com

May 7, 2021

**VIA EMAIL AND U.S. MAIL**

Jared Gist
jaredgist@gmail.com
Caprock Orthopaedic Consultants, LLC
4004 106th
Lubbock, TX  79423

Re:    Wright Medical

Dear Mr. Gist:

This law firm serves as litigation counsel to Wright Medical Technology, Inc. and Tornier, Inc. ("Wright").  We are writing to you so that you may avoid costly litigation which will be filed against Caprock Orthopaedic Consultants, LLC, Exactech, you personally (collectively "Caprock") and/or anyone acting in concert with Caprock for breach of contract, tortious interference, misappropriation of trade secrets, fraud and possibly other claims.  As you know, Wright wrote to you previously on January 18, 2021 and February 9, 2021 regarding your post-termination obligations regarding non-competition, non-solicitation and confidentiality, as well as violations of those obligations.  Despite your February 12, 2021 email assurance that you intend to abide by your agreement with Wright, you have done nothing of the sort.  Instead, you are engaged in deliberate and brazen violations of your agreement which will not be tolerated.

In particular, Wright has direct evidence, eyewitnesses and information of the following violations:

1.    Cases covered by and solicitations by you and Caprock of Doctors Verdugo, Pankratz, Carr, Flores, Campbell, Farr and Simpson on multiple occasions.

2.    Photos of Exactech product in prohibited procedures/hospitals with your name on the labeling.

3.    Exactech product and loaners in your office.

4.    Solicitations of Messrs. Redwine, Needham, Goddard and Hullum to improperly sell Exactech products in prohibited territories.

5.    Attempts to use agents and/or ASR's to cover cases at your behest and/or the behest of Caprock.

6.    Exactech personnel in prohibited procedures with yourself.



7.      Communications with doctors and/or their staff scheduling improper procedures.

8.      Labs with doctors prohibited under your agreement.

9.      Trip(s) to Exactech in Florida openly flaunting your intent to violate your post-termination obligations owed to Wright.

10.     Questionable entity practices and deception of ownership.

      This conduct is shocking, traceable and actionable.  Further, Exactech's apparent complicit behavior in all of this is further disturbing. Wright takes these issues seriously in that during your distributor relationship with Wright you had access to Wright's customer relationships and confidential information.  These materials include, but are not limited to, the identity of Wright's customers, financial information, marketing information, pricing, margins, product specifications, customer information, strategies, techniques, know-how and development.

      Significantly, pursuant to your Wright agreement, you are directly and indirectly prohibited for one year from December 27, 2020 from (i) competing with Wright in the territory you previously serviced for Wright, (ii) soliciting or selling competitive products to Wright customers within the territory you previously serviced or supervised for Wright, (iii) utilizing or disclosing Wright confidential information, and (iv) soliciting Wright employees or persons or otherwise engaged to perform services for the company, among other obligations.

      The purpose of this letter is to alert you to the fact that Wright intends to enforce its rights against Caprock and anyone acting in concert with Caprock, if such action is necessary. Should Wright succeed on the merits of a legal proceeding, Caprock may be responsible for attorney's fees and damages incurred as a result of breaches of the agreement and violations of state and federal law.

      If Wright does not receive your written, sworn assurance that these activities are ceasing immediately by May 14, 2021, and in fact the activities cease, Wright will pursue all legal remedies available to it.  Our firm routinely litigates these issues and will not hesitate to do so in this instance.  Please be governed accordingly.

      Wright sends this letter without waiving or prejudicing its rights to pursue all forms of legal relief against you, Caprock and Exactech.  You are directed to ensure that all documents, records, evidence, electronic data and metadata related to these issues are preserved and are not altered, destroyed or compromised in any way whether in hard copy or an electronic format.



Jared Gist
May 7, 2021
Page 3

If you would like to discuss this matter further, you may contact me at (312) 460-5559.

Very truly yours,

SEYFARTH SHAW LLP


/s/ Michael D. Wexler


Michael D. Wexler


MDW:cmr
cc:     Thomas McAllister
        Donna Edwards, General Counsel, Exactech (via email donna.edwards@exac.com)

# Seyfarth

**Seyfarth Shaw LLP**
233 South Wacker Drive
Suite 8000
Chicago, Illinois  60606-6448
**T** (312) 460-5000
**F** (312) 460-7000

mwexler@seyfarth.com
T (312) 460-5559

www.seyfarth.com

May 7, 2021

**VIA EMAIL DONNA.EDWARDS@EXAC.COM**

Donna Edwards
General Counsel
Exactech, Inc.
2320 NW 66th Court
Gainesville, FL  32653

Re:    Jared Gist/Wright Medical

Dear Ms. Edwards:

Enclosed please find a letter to Jared Gist (including Caprock Orthopaedic Consultants, LLC), an Exactech distributor which is violating post-employment obligations owed to Wright Medical Technology, Inc. and Tornier, Inc. (collectively "Wright").  Exactech was copied on two prior correspondences to Mr. Gist on January 18, 2021 and February 9, 2021.  Exactech failed to respond to these letters and Mr. Gist's and Caprock's improper activities on behalf of Exactech continue unabated.  It is clear to Wright that Mr. Gist, Caprock and Exactech are engaging in these improper activities deliberately and with knowledge of the express contractual and legal obligations owed to Wright.

If these activities do not cease, and an amicable resolution worked out immediately, further legal action will be taken to address the situation.  You are directed to ensure that all documents, records, evidence, electronic data and metadata related to these issues are preserved and are not altered, destroyed or compromised in any way whether in hard copy or an electronic format.

Very truly yours,

SEYFARTH SHAW LLP

*/s/ Michael D. Wexler*

Michael D. Wexler

MDW
cc:    Thomas McAllister via email Thomas.McAllister@wright.com

70399360v.1